**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                      **Case No. 3:25-cr-98-WWB-LLL**

**GEOFFREY LEE DUDDING**
_____/

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. Dudding asks this Court to sentence him to 240 months in the Bureau of Prisons followed by 15 years of supervised release.

## Case History

In November of 2024, Mr. Dudding had just gotten paroled from prison in South Carolina. He was homeless and jobless. He moved back in with his father and his brother in Concord, North Carolina. He was depressed, broke, and lonely. He was not on sex offender probation. Mr. Dudding was trying to find work, unable to live on a very small V.A. disability benefit and food stamps alone. He began drinking heavily to numb himself.

Mr. Dudding used his cell phone to communicate with strangers on the internet and social media to find connection. He had been in and out of chatrooms his whole life from the early days of AOL and MySpace. Mr. Dudding assumed that anyone in any given chatroom could be a liar. There are entire TV shows dedicated to being "Catfished"[1], where a person on the internet creates a fake persona to

_____
[1] Catfish: The TV Show, *MTV*, airing between 2012-2020.

trick other people into giving them money or falling in love.

In January of 2025, FBI agents began fishing on Kik in the group "Daught fun"[2] to see if they could catch people trying to engage in sexual activities with minors. The agent posted things like "I like that 9yo", "florida here", "yea she's 11". The FBI agent used software to age-regress a pictures of a female agent to look more child-like and posted it in the chat as an advertisement for his 11-year-old daughter.

During their conversations, both Mr. Dudding and Agent Moxley were lying. Mr. Dudding claimed to be in Atlanta (he wasn't), claimed to have a job (he didn't), claimed his name was "Mark" (it's not), claimed to have a car (he didn't), and claimed to be able to come to Florida (he couldn't- because he did not have transportation or any money). Mr. Dudding sent Agent Moxley a video of himself masturbating to the "minor's" picture.

Mr. Dudding did not believe that the "minor" was only 11 despite agent Moxley telling him so because she "looked older". Agent Moxley offered to do a phone call between the "minor" and Mr. Dudding, but Mr. Dudding allegedly fell asleep and did not call in at the expected time. After that, Mr. Dudding asserts several times that he believes Agent Moxley is a "cop", "the police", and a "fed",

---

[2] As the group chat name implies, this group is premised upon people who were communicating about sexual exploits with their daughters.

yet he continues the conversation and sexual requests from the "father". Eventually, a female agent acting as the minor and Mr. Dudding connect for a few phone calls in quick succession. They have several innocuous conversations that get disconnected quickly. Thereafter, Mr. Dudding sends messages to Agent Moxley about wanting to have sex with the "minor". He alleges that he will come to Jacksonville and rent a hotel room but makes no concrete plans to follow through. Eventually, the conversation tapers off and Mr. Dudding makes no further contact with Agent Moxley after March 6, 2025.

On May 8, 2025, Geoffrey Dudding appeared for his appointment at the Cabarrus County Sheriff's Office for his sex offender registration. Mr. Dudding was Mirandized, and he initially invoked his right to counsel. Mr. Dudding was placed under arrest and handcuffed. He repeatedly asked why he was being arrested, but he was told that he needed to waive his right to counsel for any explanation. He asked if he could be transported to Mecklenburg County, and he was told "no", that it was an out of district warrant. Mr. Dudding asked to see the warrants, and he was eventually allowed to see them. He had never been to Florida and did not understand why the warrant was issued there.

Mr. Dudding asked if he was going to be given an attorney, and they told him "not today". The agents told Mr. Dudding that they would not answer any of his questions about the charge or process unless he agreed to waive his rights.

3

Only then did Mr. Dudding then agree to speak to agents without a lawyer.

Mr. Dudding did not understand why FBI agents from Jacksonville were there to speak to him. The very first thing the agents did was show Mr. Dudding a picture of the "minor" he had been communicating about several months prior. The agents told Mr. Dudding that she did not come home from school two days ago, and they believe that he had abducted her. That statement by the agents was a lie, there was no child- it was an A.I. age-regressed photo of an agent, and she was not missing. Because Mr. Dudding was genuinely afraid for the safety of the child, he admitted that he had spoken to her dad years prior (which was also lie, it was only months prior). Mr. Dudding wanted to do anything to help them find the fake child that had not really been abducted. The agents repeatedly accused Mr. Dudding of traveling to Jacksonville and of abducting a "child" that did not exist. He was adamant that he had nothing to do with the child's disappearance.

The agents continued the fake kidnapping story through Mr. Dudding's entire interview, booking, and his transport. Mr. Dudding would admit to communicating about the child and with the child, but would, obviously, not admit to abducting her because she did not exist. In fact, Mr. Dudding did not know the agents had lied to him until counsel told him weeks later. At his initial appearance, he finally learned that his intuition was correct, and he had been speaking to FBI agents the whole time, and the whole situation had been a ruse.

4

## History and Characteristics of Mr. Dudding

**Family and Childhood**

Geoffrey Dudding, 40, was born and grew up in St. Albans, West Virginia, a suburb of Charleston, the capital city. Mr. Dudding reports having an overall good home life as a child with no domestic issues. His parents were married in 1985, and he was the eldest of three children. Mr. Dudding has a younger sister named Holly and a younger brother named Kyle. Growing up, Mr. Dudding was especially close to his mother, Dana, who died of cancer in 2016. [3]

His father Randy, now 70, struggled with alcohol dependence, which put financial stress on the family, but he is now in recovery. Geoffrey Dudding also is a recovering alcoholic, and, before his arrest, he began attending 12-step support groups with his father in North Carolina.  He considers Randy Dudding a mentor in this area. [4]

He graduated on time from St. Albans High School[5] before joining the U.S. Marine Corps Reserves at Camp Lejeune, North Carolina, where he was an engineer.  He did not see combat.   Afterward, he briefly attended Marshall University business college in West Virginia.

---

[3] Dana Dudding's obituary is attached as Exhibit  1.
[4] Letters from Mr. Dudding's father and brother are attached as Exhibit 2.
[5] Mr. Dudding's high school transcript from St. Albans High School is attached as Exhibit 3.

Despite a good home life, there was trauma in Mr. Dudding's childhood. He reports being molested by an older boy when he was 7 or 8 years old.[6]  He also told Dr. Ferraiuolo he had multiple concussions as a youth, mostly from sports injuries, and she found evidence of post-concussion syndrome.[7]

The Dudding family also experienced inter-sibling sexual trauma. Mr. Dudding pled guilty to taking indecent liberties with his sister and was sentenced to prison in 2007 when he was 21 years old. Mr. Dudding was supposed to participate in sex-offender counseling and treatment, but Mr. Dudding  was forced to have sex by an employer in exchange for housing. He left that job and then was unable to afford the cost of the treatment or find housing. His parents moved him back into the home with his sister, despite a no contact provision, which sent Mr. Dudding back to prison.

**Relationships**

Mr. Dudding has never been married and has no children. He explained that he was in a committed relationship with an age-appropriate woman, but that she

---

[6] Though there is no official report of this event, Mr. Dudding reported it to both his Veterans Administration (VA) psychiatrist in 2020 and to Dr. Dolly Ferraiuolo, LCSW, who was retained by the undersigned to evaluate him in this case. Records of Mr. Dudding's psychiatric treatment at the VA hospital in Salisbury, North Carolina are attached as Exhibit 4.  Dr. Ferraiuolo's forensic report is attached as Exhibit 5.
[7] Ferraiuolo, p. 11.

was an alcoholic. He believes that his own alcoholism peaked during his relationship with her.

### Substance Abuse and Mental Health

Mr. Dudding was abusing marijuana at 13 and began drinking at 15. Though marijuana is increasingly viewed as mostly harmless by a large segment of society, studies have shown that early onset marijuana use, described as younger than 16, can be especially harmful to young, undeveloped brains, correlating with higher impulsivity and impaired decision-making well into adulthood.[8] Mr. Dudding's early-onset and chronic marijuana abuse offers, especially combined with his long history of alcohol abuse,  not an excuse but a reasonable and at least partial explanation for his struggles as an adult and with the criminal justice system, including his admittedly criminal sexual decisions.  The long history of alcohol abuse likely only made matters worse. Mr. Dudding was heavily abusing alcohol during this case. Mr. Dudding also suffers from lifelong ADHD, depression and anxiety.

Mr. Dudding's life has unraveled with arrests, periods of homelessness and additional trauma.  Mr. Dudding witnessed several drive-by shootings and a deadly

---

[8] See, for instance: Kristin Weir, *Marijuana and the developing brain*, American Psychological Association, November 2015; and Staci A. Gruber et al, *Worth the wait: effect of age of onset of marijuana use on white matter and impulsivity*, Psychopharmacology, Nov. 5, 2013.

fentanyl overdose while living on the street.  Then in 2016, Dana Dudding died at home from uterine cancer.  She was only 57.  According to his father, Mr. Dudding and his siblings assisted with her care until the end.  Mr. Dudding was devastated and accelerated his drinking to drown his sorrow.  He later told his VA providers he noticed mood changes in himself after his mother's death.

Dr. Ferraiuolo recommends a sentence that includes substance abuse treatment coupled with  intensive, trauma-informed mental health treatment to address particularly Mr. Dudding's PTSD.  She believes these treatments will reduce his relapse risk and strengthen his readiness for re-entering society in the future.[9]

Mr. Dudding also will need sex offender treatment with trauma informed counseling to address his significant issues.  One study has suggested that posttraumatic stress disorder in particular is known to cause changes on functional neuroimaging in areas similar to those found in people who have sexual attraction to children, such as the prefrontal cortex, orbitofrontal cortex, and the insula. [10]  The trauma from sexual victimization is thought to cause problems with particular parts of brain development and maturation or can

---

[9] Id, pp. 13-14.

[10] Rauch SL, Shin LM, Phelps EA. Neurocircuitry models of posttraumatic stress disorder and extinction: human neuroimaging research—past, present, and future. *Biol Psychiatry*. 2006; 60: 376– 382.

represent brain changes that have resulted from life experiences, such as being physically abused and sexual victimized themselves. [11]

**Military Service**

Mr. Dudding enjoyed the three years he spent in the Reserves. Unfortunately, he was discharged at age 20 because of his marijuana use and being absent without leave. He recognizes now that he squandered a fantastic opportunity for childish reasons.

Since 2020 until his arrest, Mr. Dudding has been treated at VA facilities in North Carolina. He has a 10 percent service-connected disability for tinnitus, but much of his treatment has focused on psychiatric care. In 2020, he was voluntarily admitted to a VA psychiatric facility for treatment of mood disorder, alcohol dependence and for the administration of psychotropic medications.[12] VA doctors also noted a history of depression and homelessness.

**Nature and Characteristics of the Offense**

Mr. Dudding recognizes the seriousness of this offense. However, his conduct did not involve a child victim. Instead, this entire criminal episode dealt

---

[11] Liberzon I, Martis B. Neuroimaging studies of emotional responses in PTSD. *Ann N Y Acad Sci*. 2006; 1071: 87– 109.
[12] A list of his medications from that time period, provided by the VA, is attached as Exhibit 6.

with fictional people on the internet. In considering the characteristics of this offense in comparison to similarly situation individuals, Mr. Dudding did not actually travel to any location, nor did he make specific plans to travel. When Mr. Dudding was arrested, he did not have any child pornography on his cell phone, which is very unusual for these types of cases.

Although Mr. Duffing was having similarly inappropriate conversations with another detective on a different social media platform, there is no indication that he actually traveled to any location in any of these cases or had any concrete plans to travel. In his mind, this was fantasy hidden behind a phone screen.

**General and Specific Deterrence, and Promoting Respect for the Law, Protection of the Public and Just Punishment**

A sentence of 240 months provides adequate general and specific deterrence in this case and shows respect for the law. Mr. Dudding needs substance abuse and trauma-informed mental health treatment. As noted by Dr. Ferraiuolo, Mr. Dudding's offenses are best understood not as isolated acts of calculated predation, but as maladaptive reenactments of unresolved trauma. He rationalized his harmful behavior as "protective" and "educational" and found belonging and validation in the Kik sexual fantasy forums which normalized deviant sexual fantasies rather than challenging them.

Mr. Dudding was not in the Kik forum looking to hurt a child. He believed that

the internet was full of people making up stories, and he says he was exploring deviant sexual fantasies. When he believed the fictional minor in this case was in danger, he was visibly upset and attempted to  provide information to help. He was looking for a person and a place to be accepted, knowing he was damaged and vulnerable without being judged. Because Mr. Dudding never participated in sex offender treatment, despite his criminal record, he did not develop the tools and strategies to challenge illegal sexual interests or to develop pro-social connections, and he unfortunately reverted back to excessive alcohol use and re-offending almost immediately after his release.

Mr. Dudding has the capacity for change, as he is ashamed by his actions, acknowledges his issues, and has a strong desire to be a productive member of society. He is not a remorseless sociopath. While being at the Bradford County Jail he has obtained over 30 certificates and continues to have goals to better himself.[13] Mr. Dudding has sought psychiatric help before, but never fully disclosed all his needs to receive treatment for sexual trauma processing, sexual education and boundary repair, and impulse control, which all can be addressed in sex offender treatment through the Bureau of Prisons and the treatment providers during Supervised Release.

---

[13] Certificates are attached as Exhibit 7.

## Guidelines Arguments

Mr. Dudding's advisory sentencing guideline range is significant at 360 months to a potential life sentence. The base offense level is driven primarily by the age of the "minor" purportedly being 11. This increases the guidelines by +8 levels for USSG § 2G1.3(b)(5) for a child not yet attaining the age of 12. The theory behind this enhancement, is that people with pedophilia, or attraction to prepubescent children are more criminal culpable than other offenders. However, this age cut off seems to be a somewhat arbitrary number. Based on his offending history, Mr. Dudding would have likely had the same conversations whether the FBI indicated the minor was 11, 12, 13, 14, or 15. He states multiple times that he did not believe the child was 11 because she looks and sounds older. Mr. Dudding has no prior history with pre-pubescent children.

Instead, all his criminal offending appears to be more in the hepehilia range which is sexual attraction to individuals in early adolescence between 11-15 years of age.[14] It is not a coincidence that the agents develop the target profiles for 11-year-olds. In selecting the specific age of 11, the F.B.I. agents knowingly set up a situation for the highest offense level possible closest to the cutoff range for

---

[14] Blanchard R, Lykins AD, Wherrett D, Kuban ME, Cantor JM, Blak T, Dickey R, Klassen PE. Pedophilia, hebephilia, and the DSM-V. Arch Sex Behav. 2009 Jun;38(3):335-50. doi: 10.1007/s10508-008-9399-9. Epub 2008 Aug 7. PMID: 18686026.

pedophilia. It is uncommon for FBI target profiles to feature a 7, 8, 9, or even a 10-year-old. While the FBI's conduct is legally permissible, it creates a situation where the guideline range is artificially inflated for pedophilic danger without a scientific tie to the difference between pedophilia and hepephilia and for the primary purpose of increasing the sentencing guideline range.

Mr. Dudding also receives a two-level increase pursuant to USSG § 2G1.3(b)(3) for use a computer and another USSG § 2G1.3(b)(4)(A) for "sexual contact". Use of a computer or a smart phone is pervasive with this charge. Nearly every defendant charged with this criminal activity also receives this enhancement, so it does nothing to differentiate between offenders. The sexual contact garnering additional enhancement in this case is Mr. Dudding touching himself.

Mr. Dudding believes that a base offense level of 34, representing the repeat and dangerous sex offender is a more appropriate and fair guideline in this case as noted in paragraph 25 of the PSR. A base offense level of 34 provides adequate enhancement for a repeat and dangerous sex offender, while not overstating the use of the computer or age of the victim.

Furthermore, Mr. Dudding's criminal history categorization of VI is overstated. He receives several points for being only months or weeks within applicable time periods. For example, his first charge at age 21 occurred in 2007, and the only reason why he is assessed three criminal history points, is due to a

13

violation of probation that extended his final release from prison into 2011 instead of 2010 for conduct that occurred nearly 20 years ago.( ¶ 30 PSR). Mr. Dudding is assessed another point to his criminal history because his conduct in this case started on January 15, 2025, just three weeks before his parole was terminated on February 6, 2025. ( ¶37 PSR).

Mr. Dudding also receives 6 separate criminal history points for Criminal Solicitation of a Minor out of Lexington, SC (¶ 32PSR) and Solicitation of a Child by Computer in Wake County, N.C. (¶ PSR 33). These incidents occurred during the same course of conduct. All the communications in those cases with "minors" (actually undercover police officers), occurred during the one-month period between August 3, 2021, and September 4, 2021, and were investigated by a joint taskforce of the two states. Mr. Dudding received separate sentences but was never released between the cases. He was first prosecuted in Lexington, S.C. on September 14, 2021, and then extradited to North Carolina without ever being released from custody. While these two incidents are technically able to be scored separately due to being prosecuted in separate jurisdictions, they represent one criminal course of conduct for a month-long period in 2021. Assessing 4 criminal history points instead of 6 would more accurately reflect the nature of Mr. Dudding's criminal history with respect to that situation.

While the sentencing guidelines as calculated by the probation department

14

are legally correct, they create a situation in which very short time periods play an oversized role in Mr. Dudding's advisory sentence. If the Court were to consider an advisory guideline range for a base offense level of 34 with a criminal history categorization of  V that would produce an advisory guideline range of 235-293 months, which is more appropriate in a case such as this with a fictitious victim and no offender travel, rather than a 360 to life sentence. A 240-month sentence still accounts for Mr. Dudding's conduct as a repeat and dangerous sex offender and is a severe and significant sentence for his conduct in this case.

### Conclusion

The mandate of 18 U.S.C. §3553(a) is, of course, for the Court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of that same statute. [15] In *Rita v. United States,* 551 U.S. 338, 347-348 (2007), the Court summarized the now often-cited factors found in that second paragraph: the "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, and

---

[15] "It is worth noting that a district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" of section 3553(a)(2). Reasonableness is the appellate standard of review in judging whether a district court has accomplished its task."  *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006).

(d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution."[16]

A sentence of 240 is sufficient, but not greater than necessary to comply with the purposes of sentencing. It will incapacitate Mr. Dudding for a significant period to protect the public, while also providing significant deterrence and being just punishment. A 240-month sentence is severe and punitive for a crime with a fictional victim and no travel. 240 months is plenty of time for the BOP to begin appropriate treatment for mental health issues and substance use. Finally, Mr. Dudding has never served anything close to a twenty-year sentence. His longest sentence to date has been 2 years. Furthermore, Mr. Dudding has shown that he can be successful with portions of his life of law-abiding behavior including between 2015 and 2021, and he can, with appropriate treatment and supervision, be rehabilitated to remain a productive member of society.

Finally, the structure of supervised release and sex offender conditions will ensure that Mr. Dudding does not continue this conduct. He will be required to have his devices restricted and monitored for the rest of his life. He will be required to register as a sex offender, and have his activities monitored, while being

---

[16] *See also United States v. Hunt*, 459 F.3d 1180, 1182 (11th Cir. 2006).

required to participate in polygraphs and ongoing treatment and therapy. The combination of a significant incarcerative sentence along with the conditions of supervised release are a combination that the court should feel confident will protect the public, provide for just punishment, and rehabilitate Mr. Dudding.

Dated: January 7, 2026.

**CHARLES L. PRITCHARD JR.**
**FEDERAL PUBLIC DEFENDER**
**MDFL**

Respectfully submitted by:

***/s/ Kathryn Sheldon***
Kathryn E. Sheldon
Assistant Federal Defender
Florida Bar No. 1019538
200 W. Forsyth St, Ste. 1240
Jacksonville, Florida 32202
(904) 232-3039
E-Mail: Kathryn_sheldon@fd.org
Counsel for the Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on January 7th, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/Kathryn Sheldon*
Assistant Federal Defender

18