# FERRA FORENSICS
## EDUCATE. MITIGATE. ADVOCATE.

## BIOPSYCHOSOCIAL

**DEFENDANT:** Geoffrey Dudding   **DOB:** ▮
**CASE NO.:** 3:25-CR-98-WWB-LLL   **DATE OF ASSESSMENT:** 08/22/2025

**METHOD OF ASSESSMENT:**
- In-person interview with Mr. Dudding on August 22, 2025
- Record review with documents provided by the Federal Public Defender
- Adverse Childhood Experiences Assessment
- Davidson Trauma Scale (DTS)
- World Health Organization's Adult ADHD Self-Report Scale (ASRS v1.1)

**RESPECTFULLY SUBMITTED BY:**
Dolly Ferraiuolo, PhD, LCSW
Licensed Clinical Social Worker #SW17572

---

### INFORMED CONSENT & MENTAL STATUS EXAM:

At the outset of the evaluation, Mr. Geoffrey Dudding confirmed his understanding of the evaluator's role and the purpose of the assessment. He acknowledged that the interview was conducted on behalf of his legal team for the purpose of providing the Court with background information and that it was not a therapeutic or confidential encounter. He verbalized comprehension that information shared could be included in a report submitted to the Court and voluntarily consented to proceed.

During the mental status portion of the assessment, Mr. Dudding was oriented to time, place, and purpose. He described his current mood as "neutral" but noted variability depending on the day, at times feeling *"frustrated with my situation or depressed and anxious,"* and on other days functioning on "autopilot." He endorsed physical symptoms of anxiety, including sweaty palms, shortness of breath, and a rapid heart rate, and reported occasional panic attacks. When experiencing depressive states, he described himself as withdrawing, saying, *"When I get depressed I isolate. Don't come near me, don't look at me."*

Sleep was reported as generally adequate, although he sometimes experienced nightmares that caused him to awaken in a cold sweat with feelings of panic. Appetite was inconsistent, with periods of eating normally alternating with days when he lacked desire to eat. He denied current

**FERRA FORENSICS**
EDUCATE. MITIGATE. ADVOCATE.

hallucinations or delusions, and there was no evidence of psychosis. He denied suicidal or homicidal ideation at the time of the evaluation.

Mr. Dudding reported prior prescriptions for Buspar and Trazodone, but he stated that the facility was not currently providing him these medications. He expressed frustration, stating, *"I don't feel like fighting with them about my medications. They just ignore my requests."* He acknowledged that without these medications, symptoms of anxiety and depressed mood were more difficult to manage.

When asked about hopefulness, Mr. Dudding stated, *"Not at this time. Right now I am facing life in prison so it's hard to feel hope at all."* He described occasional dissociative experiences when very anxious, during which *"reality feels like a dream or like a movie."* He reported feeling physically safe within the facility.

**CHILDHOOD & TRAUMA BACKGROUND:**

Mr. Dudding was born on <span style="background:black">████</span> 1985, in Charleston, West Virginia, where he lived until age 18. He is the eldest of three children, with one younger brother and one younger sister. He described a very close and positive relationship with his mother, who passed away in 2016, noting, *"I was mama's boy. I wouldn't run to my dad for stuff, only my mom."* His relationship with his father was described as inconsistent during childhood but is now strong and supportive.

He reported feeling loved and supported while growing up. Both parents were present in the home, and his parents did not divorce or separate during his childhood. His father was incarcerated briefly following a DUI-related accident when Mr. Dudding was very young. He denied witnessing domestic violence or experiencing physical abuse within the home.

Mr. Dudding disclosed early childhood sexual experiences that have continued to impact him into adulthood. At around age seven or eight, he was initiated into sexual activity by a neighborhood boy, approximately two years older, which involved mutual touching and oral sex. He recalled feeling conflicted, stating, *"I knew I wasn't supposed to be doing this with him, but I felt obligated to fit in with the older kids and he was teaching me."* He continues to experience shame related to these experiences and emphasized, *"I'm not into guys."* He also expressed that as a child he believed it was "normal" experimentation, though he acknowledged significant shame when reflecting back.

He also disclosed that after his first incarceration, when he sought temporary housing with a potential employer, he was coerced into sexual acts on two occasions in order to remain housed.

**FERRA FORENSICS**

EDUCATE. MITIGATE. ADVOCATE.

He left that situation after the second occurrence noting significant feelings of shame and guilt when reflecting on the situation.

Regarding basic needs, Mr. Dudding reported some financial hardship between ages eight and twelve, with reliance on food stamps, but the family always had enough to get by without too much harm. His father struggled with alcohol use disorder but is now largely sober. He denied exposure to parental mental illness or suicide attempts.

Significant losses during childhood included the death of both maternal and paternal grandparents when he was six years old, particularly the passing of his maternal grandmother, to whom he was very close. He described feeling deep sadness at that time, but is *"in a good place with it now."*

Beyond childhood, Mr. Dudding later experienced multiple additional traumas, including the death of his mother from cancer in 2016, which he described as particularly devastating, even crying at the thought of it while in the evaluation. He witnessed a close friend overdose from fentanyl and was exposed to gun violence, including drive-by shootings, while involved in drug sales in North Carolina. He described his trauma responses as alternating between "fawn and freeze," explaining that he often complied with others in an effort to be liked or accepted, and admits this is *"a great flaw"* of his.

## **MENTAL HEALTH HISTORY:**

Mr. Dudding has a history of mental health treatment through the Veterans Administration, where he was diagnosed with severe alcohol use disorder, depression, anxiety, and a general mood disorder. He reported that his rapid mood fluctuations began after his military service.

He has engaged in therapy and psychiatric care through the VA and was psychiatrically hospitalized for approximately two weeks in 2023 after discontinuing his medications and experiencing difficulty adjusting. He resumed medication management following this hospitalization.

He endorsed a history of panic attacks and flashbacks, particularly related to experiences from what he described as *"living the street life."* He continues to experience nightmares, avoidance of trauma reminders, emotional numbing, and hypervigilance, particularly in environments with sudden noise or silence. He denied suicidal ideation or prior attempts.

Mr. Dudding currently reports benefit from medication when available. Past prescriptions have included Buspar, Trazodone, and Depakote, though Depakote was discontinued due to weight

3 of 15

FERRA FORENSICS
EDUCATE. MITIGATE. ADVOCATE.

gain. He expressed that music and video games are typically grounding and soothing but noted he cannot access these coping tools while incarcerated. He acknowledged persistent guilt, shame, and hopelessness when reflecting on his past traumas, as well as occasional dissociative episodes of "zoning out" while incarcerated.

**MEDICAL HISTORY:**

Mr. Dudding denied chronic medical conditions such as diabetes, asthma, or cardiovascular disease. He reported five known concussions sustained from playing football and from street fights. He currently experiences severe headaches three to four times per week, sometimes debilitating to the point of nausea.

He reported knee pain related to military service but denied other ongoing medical issues. He has not been formally diagnosed with a disability and has not undergone major surgeries. Aside from his psychiatric medications, he is not prescribed other ongoing medications.

**SUBSTANCE ABUSE HISTORY:**

Mr. Dudding's experimentation with substances began in early adolescence. He first tried marijuana around age 12 but did not use regularly until later. He consumed alcohol for the first time at age 15, became sick, and avoided it for several years. At 17 he experimented with methamphetamine, which kept him awake for several days, but he reported that he quickly determined it was not for him. At 18, he tried cocaine and observed little impact, leading him to believe he may have ongoing untreated ADHD.

Between ages 28 and 30, Mr. Dudding entered a period of frequent clubbing during which he used MDMA ("Molly") and other club drugs. He discontinued use after becoming concerned about adulteration with fentanyl. While he experimented with multiple substances, he reported that alcohol became the most problematic due to its accessibility.

Mr. Dudding stated that daily alcohol use began after the death of his mother in 2016. He shared, *"The girlfriend I was with at the time was an alcoholic, so it made it easy for me to become one too."* He entered treatment in 2020 but admitted he was not ready to stop drinking at that time and resumed use immediately after leaving rehab. He described periods of heavy drinking resulting in tremors, appetite changes, and symptoms consistent with withdrawal. He reported one severe binge just prior to his most recent arrest, after which he realized he wanted to stop drinking.

Phone: (727) 755-3018     Email: admin@ferraforensics.com     Website: ferraforensics.com

**FERRA FORENSICS**
EDUCATE. MITIGATE. ADVOCATE.

He has since embraced sobriety, crediting his father's mentorship in recovery. He stated, *"Talking to my dad about alcohol abuse really helped because he is an alcoholic and is sober now. He's a good mentor in my sobriety."* He currently identifies as being in recovery.

### RESIDENTIAL/HOUSING HISTORY:

Mr. Dudding described frequent moves throughout his early childhood, relocating approximately every year to year and a half until age 15 or 16, when the family achieved more stability. He did not move again until entering the military, at which time his parents relocated to Charlotte.

He denied homelessness during childhood but experienced unstable housing as an adult following incarceration. He avoided moving back in with his parents due to not wanting to disrupt their lives and instead cycled through periods of homelessness, shelter stays, and couch surfing. He reported an eviction during the COVID-19 pandemic.

At the time of his most recent arrest, he had been staying intermittently with his father while also seeking entry into a shelter. He noted that in the past five years, his housing stability has been inconsistent, alternating between periods with family, shelters, and homelessness. When asked about his preferred living situation, he stated that ideally he would like his own independent housing but could also live with his brother or father if needed.

### EDUCATIONAL HISTORY:

Mr. Dudding completed high school, where he was enrolled in Advanced Placement and honors courses. He reported that schoolwork was easy for him, and he did not require special education or academic accommodations. He was suspended once during senior year for fighting but otherwise had no major disciplinary issues.

He was diagnosed with ADHD in elementary school and prescribed Ritalin, which he took intermittently. Despite this, he excelled academically, stating, *"I enjoyed school but I didn't think it was challenging enough. I did a lot of learning on my own."*

After graduation, he attended technical school for computer studies and later attempted a semester of college following his military service. However, he reported that he partied heavily during this period and decided he was not yet ready for higher education. He has not returned to higher education.

**FERRA FORENSICS**
EDUCATE. MITIGATE. ADVOCATE.

## VOCATIONAL HISTORY:

Immediately after high school, Mr. Dudding enlisted in the United States Marine Corps. He described the experience positively, stating that he loved the structure, activity, and opportunities for travel. He was discharged following his first prison stay.

After incarceration, he held a variety of jobs including car sales, call center work, construction, and restaurant cooking. He reported difficulty maintaining employment at times due to issues with alcohol use and arriving to work hungover.

When asked about his aspirations, he stated that he would like to pursue a bachelor's degree in business administration to improve his employability despite his felony record. He expressed interest in finding an employer willing to give him a chance and acknowledged the importance of vocational stability for his future.

## REPORTED GOALS:

When asked about his vision for the future, Mr. Dudding expressed a desire for stable, independent housing and long-term sobriety. He hopes to rebuild relationships with his family, particularly his father and siblings, and emphasized his wish to move forward in a constructive and meaningful way. He expressed interest in pursuing higher education and job training programs, specifically in business administration, to increase his employment options.

He identified sobriety, stability, and reconnection with family as his top priorities for release. He acknowledged that support from treatment programs, vocational opportunities, and housing stability would be essential to achieving these goals.

## MEASUREMENTS:

*Adverse Childhood Experiences Assessment:* The Centers for Disease Control and Prevention and Kaiser Permanente created the ten-question Adverse Childhood Experiences (ACE) Assessment after gathering health data from more than 17,000 members in Southern California. Based on the frequency of responses to questions, researchers were able to predict health outcomes using study data. The 10 sections of the ACE assessment look at family dysfunction, physical and emotional neglect, and emotional, physical, and sexual abuse (family mental illness, physical abuse of mother, divorce, incarcerated parent, and substance abuse in family).

Based on Mr. Dudding's reported history, his ACE score is calculated as follows:

**FERRA FORENSICS**
EDUCATE. MITIGATE. ADVOCATE.

- **Emotional Abuse** – Denied. Score: 0
- **Physical Abuse** – Denied. Score: 0
- **Sexual Abuse** – Reported sexual coercion/experimentation with a neighborhood peer at age seven or eight. He described ongoing shame about these experiences and acknowledged that they were not developmentally appropriate. Score: 1
- **Neglect (Emotional)** – Denied. Score: 0
- **Neglect (Physical)** – Reported limited resources and reliance on food stamps between ages eight and twelve but denied unmet basic needs. Score: 0
- **Household Substance Abuse** – Father had an alcohol use disorder during childhood. Score: 1
- **Household Mental Illness** – Denied. Score: 0
- **Parental Separation or Divorce** – Denied. Score: 0
- **Domestic Violence** – Denied. Score: 0
- **Household Member Incarceration** – Father was incarcerated briefly for DUI when client was very young. Score: 1

**Total ACE Score: 3 out of 10**

Although this score is lower than many clients who present with complex developmental trauma, it still reflects significant exposure to adverse experiences during formative years, particularly childhood sexual abuse, parental substance abuse, and parental incarceration. These experiences, combined with later life traumas (the sudden loss of his mother, exposure to community violence, sexual coercion in adulthood, and witnessing a friend's overdose), contributed to the development of maladaptive coping mechanisms and enduring trauma-related symptoms.

*Davidson Trauma Scale (DTS) Summary and Interpretation:*
**DTS Results:**
Frequency Score: 49/68
Severity Score: 53/68
Total Score: 102/136
**Interpretation:** Moderate to High PTSD symptoms present.

The Davidson Trauma Scale is a standardized tool used to evaluate the frequency and severity of symptoms associated with post-traumatic stress disorder (PTSD). It measures distress across three domains commonly disrupted by trauma: intrusive recollections, avoidance and numbing, and hyperarousal. Mr. Dudding's DTS score of 102 out of 136 reflects a moderate to high level of PTSD symptoms and suggests that trauma significantly affects his daily functioning and psychological well-being.

**Phone:** (727) 755-3018   **Email:** admin@ferraforensics.com   **Website:** ferraforensics.com

# FERRA FORENSICS
## EDUCATE. MITIGATE. ADVOCATE.

**Intrusive Symptoms:** Mr. Dudding reported recurrent distress related to multiple traumatic experiences, including childhood sexual abuse, sexual coercion in adulthood, and traumatic events during his time involved in drug culture. He recalled flashbacks from *"living the street life"* and witnessing a friend fatally overdose on fentanyl. He also described nightmares that caused him to awaken in a cold sweat and panic, experiences that continue to disrupt his sleep. Additionally, the death of his mother from cancer in 2016 was described as a profound emotional blow that resurfaces in painful recollections. These intrusive symptoms occur unexpectedly and interfere with his ability to focus and maintain emotional stability. His responses represent a high score in the intrusive domain of the DTS.

**Avoidance and Numbing:** Mr. Dudding acknowledged that when he becomes depressed, he isolates. He described periods of emotional detachment, as well as dissociative episodes. He avoids reminders of his trauma, including people and environments associated with violence and substance use. He also expressed deep shame and guilt about his past, particularly regarding his childhood experiences and the impact of his actions on his family, acknowledging that it is *"hard not to dwell"* on these memories. These patterns reflect long-standing avoidance-based coping and emotional numbing, which are consistent with the high score in the avoidance/numbing cluster.

**Hyperarousal:** Mr. Dudding endorsed physical manifestations of anxiety including sweaty palms, shortness of breath, and rapid heart rate, along with occasional panic attacks. He reported being easily startled and hypervigilant, particularly when there is sudden noise or silence. He also experiences frequent, debilitating headaches three to four times per week, which may be exacerbated by stress and prior head trauma. His difficulty maintaining consistent sleep due to nightmares further reflects a pattern of physiological hyperarousal. These symptoms demonstrate that he remains in a heightened state of alertness and reactivity, aligning with the high score in the hyperarousal domain.

**Overall Impact of the DTS Score and What It Means:** A score of 102 out of 136 on the Davidson Trauma Scale supports that Mr. Dudding meets the criteria for PTSD. His symptoms extend beyond isolated distress and permeate daily functioning, relationships, and coping mechanisms. The combination of intrusive recollections, emotional numbing, and hyperarousal demonstrates the enduring effects of trauma exposure and the absence of sustained treatment or recovery. These symptoms reflect not volitional choices but ingrained psychological responses to trauma, underscoring the importance of structured treatment and support in mitigating risk and fostering rehabilitation.

# FERRA FORENSICS
## EDUCATE. MITIGATE. ADVOCATE.

***World Health Organization's Adult ADHD Self-Report Scale (ASRS v1.1):***

The World Health Organization's Adult ADHD Self-Report Scale (ASRS v1.1) is an 18-item questionnaire, most often administered initially as a 6-item screener, designed to identify symptoms of adult Attention-Deficit/Hyperactivity Disorder (ADHD) in alignment with DSM criteria. Developed and validated in collaboration with the WHO, it demonstrates strong sensitivity (up to 90%) and specificity (up to 80%) for detecting ADHD in both community and clinical settings. Respondents rate the frequency of inattentive and hyperactive/impulsive behaviors on a 5-point scale ("Never" to "Very Often"), and endorsement of four or more of the six key items constitutes a positive screen.

The ASRS is widely regarded as a reliable, efficient first-line tool to guide further diagnostic evaluation. Its brief structure allows for rapid administration while maintaining empirical support across populations. In forensic contexts, it provides clinically useful data to highlight executive-function vulnerabilities that may contribute to impaired judgment, impulsivity, and difficulty with sustained focus. These factors are highly relevant in mitigation, as they illuminate cognitive and emotional barriers to adaptive functioning that may underlie or exacerbate criminal behavior.

**Part A: 6-Item Screener** (Responses range from: *Never, Rarely, Sometimes, Often, Very Often*)

1. **How often do you have trouble wrapping up the final details of a project once the challenging parts have been done?** *Often – consistent with history of losing follow-through once structure or novelty is gone.*
2. **How often do you have difficulty getting things in order when you have to do a task that requires organization?** *Often – described difficulties managing tasks, inconsistent employment history, and overwhelm in structured settings.*
3. **How often do you have problems remembering appointments or obligations?** *Sometimes to Often – pattern of distractibility and disorganization suggests frequent forgetfulness.*
4. **When you have a task that requires a lot of thought, how often do you avoid or delay getting started?** *Often to Very Often – described procrastination and avoidance when overwhelmed or uninterested.*
5. **How often do you fidget or squirm with your hands or feet when you have to sit down for a long time?** *Sometimes to Often – military and sports history indicate high activity preference; struggles with stillness.*
6. **How often do you feel overly active and compelled to do things, like you were driven by a motor?** *Often – ADHD history, impulsivity, and periods of high-risk behavior align with this symptom.*

9 of 15

# FERRA FORENSICS
## EDUCATE. MITIGATE. ADVOCATE.

**Part B: Additional 12 Items** (Responses range from: *Never, Rarely, Sometimes, Often, Very Often*)

1. **How often do you make careless mistakes when working on a boring or difficult project?** *Often – inattentive errors increase when tasks lack novelty or are effortful.*
2. **How often do you have difficulty keeping attention when doing boring or repetitive work?** *Very Often – sustained attention drops quickly without stimulation; consistent with adult ADHD.*
3. **How often do you have difficulty concentrating on what people say, even when they are speaking directly to you?** *Often – auditory inattention and internal distraction reported across settings.*
4. **How often do you misplace or have difficulty finding things at home or at work?** *Sometimes to Often – disorganization and poor working memory lead to misplacing items.*
5. **How often are you distracted by activity or noise around you?** *Often – environmental distractibility noted, especially with sudden noise or shifts to quiet.*
6. **How often do you leave your seat in meetings or situations where you are expected to remain seated?** *Sometimes — restlessness and motor activity increase with prolonged sitting.*
7. **How often do you feel restless or fidgety?** *Often – chronic internal restlessness consistent with hyperactive/impulsive features.*
8. **How often do you have difficulty unwinding and relaxing when you have time to yourself?** *Sometimes – relies on music/video games to decompress; limited access in jail reduces relaxation capacity.*
9. **How often do you find yourself talking too much when you are in social situations?** *Sometimes – impulsive speech emerges with stimulation or anxiety.*
10. **When you're in a conversation, how often do you find yourself finishing the sentences of the people you're talking to before they can finish them themselves?** *Sometimes – impulsive responding and difficulty delaying output.*
11. **How often do you have difficulty waiting your turn in situations when turn-taking is required?** *Sometimes to Often – impatience increases with stress, boredom, or cue overload.*
12. **How often do you interrupt others when they are busy?** *Sometimes – impulse control challenges and urgency to act can override social timing.*

**Overall Impact of the *ASRS v1.1* Score and What It Means:** Mr. Dudding was diagnosed with ADHD in childhood and intermittently treated with stimulant medication (Ritalin). His own reports of distractibility, impulsivity, and difficulty maintaining focus are consistent with ADHD

symptomatology across his lifespan. He further described substance use patterns (e.g., minimal response to cocaine, which he attributed to ADHD neurochemistry) and work difficulties (e.g., showing up hungover, struggling with follow-through) that reinforce the impact of untreated or undertreated ADHD symptoms. These findings suggest that ADHD continues to affect his adult functioning and that targeted accommodations and treatment could improve stability and reduce risk of maladaptive coping strategies.

**DIAGNOSIS:**

*F43.10 Post-Traumatic Stress Disorder, Chronic, with Dissociative Symptoms (depersonalization/derealization), with Delayed Expression, severe:* Mr. Dudding meets full PTSD criteria, including recurrent intrusive memories and nightmares, occasional flashbacks from "street life," active avoidance and emotional numbing (isolation, dissociation), negative cognitions and mood (guilt, shame, hopelessness), and hyperarousal (panic attacks, startle reactivity, sleep disturbance). His descriptions that *"reality feels like a dream or like a movie"* support the dissociative subtype, and the emergence/worsening after cumulative trauma exposures (childhood sexual abuse, adult sexual coercion, community violence, friend's fatal overdose, mother's death) supports delayed expression.

*F90.2 Attention-Deficit/Hyperactivity Disorder, Combined Presentation, persistent, moderate:* Childhood diagnosis with intermittent stimulant treatment, lifelong inattention (disorganization, procrastination, forgetfulness) and hyperactivity/impulsivity (restlessness, "driven by a motor"), plus current ASRS-consistent symptoms producing occupational impairment.

*F10.20 Alcohol Use Disorder, severe, in Early Remission, in a Controlled Environment:* Post-2016 daily use with tolerance, withdrawal symptoms ("shakes," appetite changes), unsuccessful quit attempts (post-2020 rehab relapse), use despite consequences, and hazardous use. He reports abstinence during incarceration with intent to maintain sobriety, consistent with early remission in a controlled setting.

*F33.1 Major Depressive Disorder, Recurrent, Moderate, with Anxious Distress:* Recurrent episodes of depressed mood, anhedonia, sleep/appetite disturbance, hopelessness, and functional impairment, with prominent anxiety and physiological arousal that complicate coping and decision-making.

*F07.81 Postconcussional Syndrome:* History of five concussions (sports and altercations) with persistent post-traumatic headaches three to four times weekly, nausea, and concentration complaints, consistent with trauma-related neurocognitive symptoms.

**FERRA FORENSICS**
EDUCATE. MITIGATE. ADVOCATE.

## **PSYCHOLOGICAL PROFILE:**

***Understanding Trauma, Sexual Development, and Cognitive Vulnerabilities:*** Mr. Dudding presents with a complex psychological profile shaped by early trauma, disrupted sexual development, neurocognitive vulnerabilities, and maladaptive coping strategies. His life history reflects significant exposure to adverse childhood experiences, including sexual coercion by an older peer at age seven or eight, parental substance abuse, and parental incarceration. These experiences occurred during critical developmental years and left him with unresolved shame, distorted beliefs about sexuality, and a pattern of "fawn and freeze" responses where he complies with others in order to feel accepted and safe.

These childhood dynamics are crucial in understanding his later sexual offenses. Mr. Dudding internalized the idea that "learning" sex from someone familiar or "safe" was preferable to being harmed by strangers. He repeated this rationalization as an adult when describing his offenses against his younger sister, stating, *"I thought it was a good idea to be the one to keep her safe if she was going to do this with anyone."* While this rationale is deeply distorted, it highlights the way in which his early sexual trauma and lack of healthy sexual education shaped his perceptions of boundaries, intimacy, and responsibility. In essence, what he experienced as confusing coercion became a template for how he related to others inappropriately.

***ADHD, Impulsivity, and Disorganized Coping:*** Compounding this trauma history is Mr. Dudding's longstanding Attention-Deficit/Hyperactivity Disorder (ADHD). He was diagnosed in childhood and continues to meet criteria as an adult, with patterns of distractibility, impulsivity, and difficulty with sustained attention and organization. These cognitive vulnerabilities limited his ability to learn adaptive coping strategies, regulate impulses, and resist acting on distorted beliefs and urges. His inconsistent academic and vocational history reflects the downstream effects of untreated ADHD, including restlessness, boredom, and susceptibility to risky peer environments.

***Alcohol Use, Depression, and Escalating Instability:*** Following his mother's death in 2016, Mr. Dudding developed severe alcohol dependence, describing daily use, withdrawal symptoms, and multiple unsuccessful treatment attempts. Alcohol functioned as a maladaptive coping mechanism to numb trauma-related distress, guilt, and depressive symptoms. Substance use compounded impulsivity, impaired judgment, and emotional dysregulation, thereby increasing his risk of reoffending and deepening his entrenchment in the criminal justice system.

***Criminal Behavior as Trauma Reenactment and Maladaptive Survival:*** Mr. Dudding's offenses are best understood not as isolated acts of calculated predation, but as maladaptive reenactments

**FERRA FORENSICS**

EDUCATE. MITIGATE. ADVOCATE.

of unresolved trauma, filtered through cognitive immaturity, distorted beliefs, and impaired self-regulation. His early victimization blurred his understanding of boundaries and reinforced rationalizations that harmful behavior could be reframed as "protective" or "educational." His later engagement in online sexual fantasy forums and solicitation charges reflect the same underlying confusion, seeking belonging and validation in spaces that normalized deviant exchanges rather than challenging them.

Socioeconomic instability and repeated incarceration also reinforced his offending cycle. His periods of homelessness, financial hardship, and disconnection from prosocial supports left him vulnerable to relapse into both substance use and maladaptive coping. Without treatment or guidance, the cognitive and emotional tools necessary to break this cycle were never developed.

*Capacity for Change:* While his history suggests risk of reoffending without intervention, it also highlights his capacity for rehabilitation if proper supports are provided. Mr. Dudding has demonstrated insight into his struggles with trauma and substance use, acknowledging shame, guilt, and the damaging impact of his actions. His expressed goals, independent housing, sobriety, reconnection with family, and vocational training, indicate motivation for change. Treatment that targets trauma processing, sexual education and boundary repair, impulse regulation, and sober living could help disrupt the reenactment cycle and provide healthier pathways for belonging and identity.

*Malingering Considerations:* Throughout the evaluation, Mr. Dudding did not demonstrate signs of malingering or exaggeration. His disclosures about sexual history, substance use, and trauma were consistent with available records and often against his own self-interest, reflecting candor rather than fabrication. His affect and presentation aligned with his reported symptoms (e.g., anxiety, dissociation, depressive withdrawal), and there was no evidence of rehearsed or overly scripted responses. The consistency across his narrative supports the validity of his self-report.

**RECOMMENDATIONS:**

1. *Intensive individual trauma-informed psychotherapy with a licensed and board certified sex therapist:* Mr. Dudding meets criteria for chronic PTSD with dissociative features and reports nightmares, panic, emotional numbing, and shame related to childhood sexual trauma and later coercion. Structured trauma therapy (e.g., EMDR or TF-CBT principles) will target intrusive memories, reduce hyperarousal, build affect regulation skills, and address maladaptive "protective" rationalizations that developed from early trauma. His offense pattern reflects distorted beliefs ("teaching," "keeping safe"), trauma reenactment, and fantasy reinforcement. Specialized treatment should

**FERRA FORENSICS**
EDUCATE. MITIGATE. ADVOCATE.

   address cognitive distortions, consent and boundary education, victim empathy, arousal reconditioning where indicated, and a personalized relapse-prevention plan aligned with the risk-need-responsivity model.
2. ***Enrollment in a dual-diagnosis substance use treatment program integrated with mental health care:*** Alcohol use escalated after his mother's death and contributed to impaired judgment, withdrawal symptoms, and occupational instability. A program that treats PTSD and addiction together will reduce relapse risk, improve coping without substances, and strengthen readiness for community reentry.
3. ***Ongoing psychiatric evaluation and medication management for PTSD, panic, depression, and ADHD:*** He reports panic attacks, dissociation, depressive episodes, and lifelong ADHD symptoms. Psychiatric oversight can optimize evidence-based pharmacotherapy (as clinically indicated) to stabilize sleep, reduce anxiety and nightmares, and improve attention/impulse control to support treatment engagement.
4. ***Neuropsychological and TBI/Headache clinic evaluation with targeted interventions:*** A history of five concussions and debilitating headaches 3–4 times weekly warrants formal assessment. Objective testing and treatment (e.g., headache management, cognitive rehabilitation strategies) can improve concentration, reduce irritability, and lower stress-related reactivity that exacerbates risk.
5. ***Structured reentry planning with housing stabilization and case management:*** Periods of homelessness and shelter living increased vulnerability to relapse and maladaptive coping. Coordinated discharge planning to stable housing (e.g., reentry housing or supervised living), benefits linkage, and transportation support will reduce criminogenic stressors and promote continuity of care.
6. ***Peer mentorship and prosocial community supports:*** Given his "fawn/freeze" interpersonal style and need for acceptance, placement with vetted peer mentors, sober support groups, and reentry programs will reinforce accountability, healthy belonging, and future-oriented decision-making.
7. ***Access to vocational training and post-secondary education aligned with his interests:*** He expressed motivation to pursue a bachelor's degree in business administration and develop marketable skills. Career services, certifications, and education during custody will increase employability, structure, and self-efficacy, which are protective against recidivism.
8. ***Digital and environmental safeguards with skills-based relapse prevention:*** Clear rules for internet use, monitored devices where applicable, and stimulus-control strategies should be paired with coping skills (urge surfing, delay/decision strategies), high-risk situation mapping, and a written support plan to manage triggers and stress.

# FERRA FORENSICS
## EDUCATE. MITIGATE. ADVOCATE.

9. ***Placement as feasible near supportive family and treatment resources:*** Regular, prosocial contact with his father and siblings, alongside access to specialized treatment, will improve engagement, hope, and stability—key conditions for learning not to reoffend.
10. ***Victim-impact, accountability, and restorative practices as clinically appropriate:*** Facilitated work on harm recognition, accountability statements, and victim empathy (without direct contact) can reduce minimization, deepen insight, and anchor behavior change in prosocial values.

Sincerely,

*Dolly Ferraiuolo, LCSW*

Dolly Ferraiuolo, PhD, LCSW
License: SW17572
Ferra Forensics, LLC